UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
AUG 23 2022
Nathan Ochsner, Clerk of Court

**INNER LIBERATION PRISON SANGHA:** SCOTT ZIRUS (a.k.a Könchok Tingdzin Wangyal); SANTHY INTHALANGSY; KENRIC LEDBETTER; DAVID MARTIN (a.k.a Etsuzen); ISAAC CARDENAS; MIGUEL BYGOYTIA; JAMES RENFRO; JUSTIN PANUS; RICHARD CROSS; and WILLIAM OLIVER.

Individually and on behalf of all others similarly situated.

PLAINTIFFS,

V.

**RELIGIOUS PRACTICE COMMITTEE;** TIMOTHY JONES; THOMAS BROUWER; C.F. HAZELWOOD; and CHRISTOPHER CARTER.

Individually and in his or her official capacity.

DEFENDANTS.

CIVIL ACTION No. ______________

## ORIGINAL COMPLAINT

I.
JURISDICTION AND VENUE

1. This is a civil action authorized by 42 U.S.C. 1983 and 42 U.S.C. 2000cc of the Religious Land Use and Institutionalized Persons Act (RLUIPA) to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. 1331 and 1343(a)(3). Plaintiffs seek declaratory relief pursuant to 28 U.S.C. 2201 and 2202. Plaintiffs claims for injunctive relief are authorized by 28 U.S.C. 2283 and 2284, and Rule 65 of the Federal Rules of Civil Procedure.

2. The United States District Court, Southern District of Texas, Houston Division is an appropriate venue under 28 U.S.C. 1391(b)(2) because it is where the majority of the events giving rise to the claims occurred.

## II.
## PLAINTIFFS

3. Plaintiffs are collectively known as the "Inner Liberation Prison Sangha" which is the community of Buddhist practitioners confined in the French M. Robertson Unit of the Texas Department of Criminal Justice in Abilene, Texas. The Inner Liberation Prison Sangha was officially established in August 2013 and has at least 35 dedicated practitioners of Buddhism.

4. Plaintiff Scott Zirus is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since August 2009 and is serving a 40 year sentence without the possibility of parole. Plaintiff Zirus is an Australian National and has been a practitioner of Buddhism since 2011. He was honored with the Buddhist name Könchok Tingdzin Wangyal by Ven. Garchen Triptrül Rinpoche after taking Refuge. Plaintiff Zirus is the 'Eastern Service' coordinator for the Robertson Unit and is the founding member and abbot of the Inner Liberation Prison Sangha.

5. Plaintiff Santhy Inthalangsy is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since June 2015 and is serving LIFE without parole. Plaintiff Inthalangsy is a Laotian-American and has been a Buddhist since birth. Plaintiff Inthalangsy is a member and elder of the Inner Liberation Prison Sangha.

6. Plaintiff Kenric Ledbetter is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since April 1992 and

is serving LIFE. Plaintiff Ledbetter has been a practitioner of Buddhism since 2001. Plaintiff Ledbetter is a member and the assistant abbot of the Inner Liberation Prison Sangha.

7. Plaintiff David Martin is an was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since November 2015 and is serving 60 years. Plaintiff Martin has been a practitioner of Buddhism since 2010. He was honored with the Buddhist name Etsuzen by Ven. Myokei Caine-Barrett after taking Refuge. Plaintiff Martin is a member and elder of the Inner Liberation Prison Sangha.

8. Plaintiff Isaac Cardenas is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since January 2017 and serving LIFE without parole. Plaintiff Cardenas has been a practitioner of Buddhism since 2021. Plaintiff Cardenas is a member of the Inner Liberation Prison Sangha.

9. Plaintiff Miguel Bygoytia is and was at all time mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since October 2014 and is serving LIFE. Plaintiff Bygoytia has been a practitioner of Buddhism since August 2018. Plaintiff Bygoytia is a member of the Inner Liberation Prison Sangha.

10. Plaintiff James Renfro is an was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since April 2013 and is serving a 30 year sentence without the possibility of parole. Plaintiff Renfro has been a practitioner of Buddhism since 2016. Plaintiff Renfro is a member of the Inner Liberation Prison Sangha.

11. Plaintiff Justin Panus is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since September 2016 and is serving LIFE. Plaintiff Panus has been a practitioner of Buddhism since 2018. Plaintiff Panus is a member of the Inner Liberation Prison Sangha.

12. Plaintiff Richard Cross is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He has been incarcerated since October 2015 and is serving 50 years. Plaintiff Cross has been a practitioner of Buddhism since 2019. Plaintiff Cross is a member of the Inner Liberation Prison Sangha.

13. Plaintiff William Oliver is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. He is currently confined in the French M. Robertson Unit, Abilene, Texas. He has been incarcerated since September 2019 and is serving LIFE. Plaintiff Oliver has been a practitioner of Buddhism since 2021. Plaintiff Oliver is a member of the Inner Liberation Prison Sangha.

## III.
## DEFENDANTS

14. Defendants collectively referred to as the 'Religious Practice Committee' (RPC) are a group of senior administrative representatives appointed by Division Directors that provides an integrated review of religious practice issues and TDCJ policy, procedures and practices. The RPC is a committee within the Texas Department of Criminal Justice.

15. The identity of each member appointed to the RPC is unknown to the Plaintiffs because TDCJ officials have refused to disclose such information on the grounds that it is privileged. Plaintiffs therefore reserve the right to amend this Complaint upon receipt of this information through discovery or other means identifying individual members of the RPC not already named as a Defendant.

16. Defendant Timothy Jones is the TDCJ Director of Chaplaincy. He is legally responsible for the operations of religious observation within the TDCJ. Upon information and belief, Defendant Jones is a permanent member and chairperson of the Religious Practice Committee.

17. Defendant Thomas Brouwer is the TDCJ Assistant Director of Chaplaincy. He is legally responsible for the operations of religious observation within the TDCJ. Upon information and belief, Defendant Brouwer is a member of the Religious Practice Committee.

18. Defendant C.F. Hazlewood is the TDCJ Director of Religious Service. He/She is legally responsible for the operations of religious observation within the TDCJ. Upon information and belief, Defendant Hazlewood is a member of the Religious Practice Committee.

19. Defendant Christopher Carter is the TDCJ Director of Rehabilitation Program Division. He has legal authority over the chaplaincy services and programs. Upon information and belief, Defendant carter is a member of the Religious Practice Committee.

20. Each Defendant is sued individually and in his or her official capacity. At all times mentioned in this Complaint, each defendant acted under color of state law.

## IV. FACTS

ABOUT BUDDHISM

21. "The Buddha" refers to the historical Shakyamuni Buddha who was born in Northern India (present day Nepal) more than 2580 years ago (at about 562BCE). He is regarded as the founder of Buddhism. He was a noble Shakyan Prince named Siddhartha Gautama who has an entire kingdom of riches to inherit but chose to renounce it at the age of 29 in search of Enlightenment (realization of the Truth of all things and True Happiness). After he attained Enlightenment at the age of 35, he taught the Truth inspiringly and tirelessly for 45 years to all who were willing to learn from him. He passed away into the deep peace of Parinirvana at 80 years of age.

22. The primary Teaching of the Buddha are contained in the collection of scriptures called the 'Tripitaka'. These consist of the sermons (Sutta or Sutra Pitaka) taught by the Buddha, the disciplinary rules of the monastic and lay community (Vinaya Pitaka) and the philosophy and psychology of Buddhism (Abhidharma Pitaka).

23. The Buddha's Teachings are called the "Dharma" (or "Dhamma" in Pali) and are based upon the solid foundation of Truth in the Four Noble Truths (Cattari-Ariyasaccani). The First Noble Truth is that life is full of Dukkha (suffering/dissatisfaction). The Second Noble Truth is that these conditions of Dukkha have causes which should be identified - To wit, craving, aversion and ignorance. The Third Noble Truth is that life can be without Dukkha. And the Fourth Noble Truth is that there is a path to lead us to transcend Dukkha and this path is called The Noble Eightfold Path (See, Dhammacakkappavattana Sutta).

24. The Noble Eightfold Path (Ariya-Atthangika-Magga) is a systematic and complete formula to rid Dukkha and attain True Happiness. It contains everything needed for virtuious living, clarity of understanding and the attaining of wisdom. The eight factors of the Noble Eightfold Path can be divided into three aspects called the Threefold Training as follows:

MORAL CONDUCT:
- Right Speech
- Right Action
- Right Livelihood

MENTAL DEVELOPMENT (CONCENTRATION):
- Right Effort
- Right Mindfulness
- Right Meditation

WISDOM:
- Right Understanding
- Right Thought

25. The Five Precepts (Panca-Sila) are given by The Buddha to be lived by one who wishes to lead a peaceful life while contributing to the happiness of family and society. The Five Precepts form the basis of universal morality in the Moral Conduct aspect of the Noble Eightfold Path, which is very important in practising the Buddhist path.

26. The Five Precepts are:

* Respect for life; Not to kill
* Respect for Personal Property; Not to steal
* Respect for Personal Relationships; Abstain from sexual misconduct
* Respect for Truth; Not to lie
* Respect for mental and Physical Well-being; Not to take intoxicants

27. For more earnest practice, Buddhist practitioners observe the Eight Precepts (Uposatha Precepts) or the Ten Guidelines (Kusala Kammapatha).

28. When a person wishes to become a Buddhist formally, the first step is to take the Three Jewels for Refuge. The Three Jewels are: The Buddha (the teacher); The Dharma (the teachings); and The Sangha (the Buddhist community). Taking Refuge is an expression of one's faith and determination in walking the Buddhist path.

29. A "practitioner" is the common term for an adherent of Buddhism.

ABOUT BUDDHISM WITHIN TDCJ AND ON ROBERTSON UNIT

30. The Buddhist community (Sangha) on the French M. Robertson Unit is called the 'Inner Liberation Prison Sangha' and was established in August 2013. This Sangha adheres to no specific Buddhist denomination and consists of at least 35 dedicated practitioners from various Buddhist traditions and schools including, but not limited to: Theravada, Mahayana, Vajrayana, Thai Forest, Nichiren Shu, Zen, Ch'an, Shambhala, Tibetan Buddhism, Vipassana, Pure Land, TM, Insight Meditation and Truth Seekers. Most Sangha members are converts, however a number are native-born Buddhists.

31. According to TDCJ Chaplaincy Policy, "Buddhism" is not recognized as a stand alone "Religious Group" for primary service purposes. Thus there are no Buddhist-only services. Instead. TDCJ recognizes Buddhism, Hinduism, Bahai, Yogi, Taoism, Hare Krishna, and sikhism collectively as a "Religious Group" under the banner of "Eastern Religions".

32. Eastern Services can either be volunteer-led or peer-led. Volunteer-led means that a TDCJ approved volunteer facilitates the primary service. These services are at least 2-hours long and anyone can attend with a 'lay-in'

regardless of their elected faith preference. Unfortunately, Buddhist volunteers that are TDCJ-approved are few and far between and because of this, most Buddhist practitioners within TDCJ custody will need to rely on peer-led Eastern Services.

33. A "lay-in" is an administratively approved pass that admits an inmate to a scheduled appointment or event, i.e. medical, religious service, education etc.

34. A peer-led service is when an inmate, or group of inmates, facilitate the primary service for other inmates. Peer-led services are limited to 1-hour per week and are only open to those with an "Eastern Religion" elected as their official faith preference.

35. The peer-led Eastern Service on the Robertson Unit are currently scheduled every Wednesday between 8.30-9.30am. However on the last Wednesday of the month, Volunteer Craig Thompson visits the Sangha between 1.00-2.00pm and leads the Eastern Service [Volunteer-led Services had been reduced to 1-hour due to COVID Protocols and have not been returned to the permitted 2-hour sessions]. This volunteer-led service is instead of (opposed to being in addition to) the normal weekly peer-led service.

36. TDCJ recognizes 7 Holy/Observance Days in 2022 for Buddhists. Six of these days Buddhists recieve a lay-in from a work assignment (making them exempt from work during that 24 hour period) and two of those six are recognized as "Communal Meals" (allowing the Sangha to gather together in the dinning hall to share a meal in commemoration of the Holy Day).

37. TDCJ recognizes no official Fast Days for Buddhists.

38. TDCJ recognized 12 "Practice days" for Buddhists in 2022. Observing Buddhists are afforded no type of accommodation for any of these 12 days i.e. no off-work lay-in, no communal meal, and no fast day recognition.

39. Buddhists have no TDCJ-recognized Retreats or special commissary purchase.

40. Buddhists are not permitted a Kesu (singing / gong bowl) during peer-led services.

41. Buddhists are not permitted a peer-led doctrinal study outside their primary Eastern Services.

42. As per TDCJ Chaplaincy Manual (CP-05-01) Buddhists are permitted to receive Mala Beads. Mala Beads are analogous to the Rosary and are used to count Mantras during meditation. The requirements for Mala Beads is that the beads must be black, be wood or plastic, and no more than 3/8 inch in size. The cord must be breakable and may be constructed of twine, leather, or an inexpensive but durable fabric. Nylon strong is not allowed.

MEDITATION CUSHIONS

43. TDCJ Policy disapproves the purchase or use of meditation cushions for personal use in cell or at the Eastern Service.

44. Meditation is a religious practice central to Buddhism - both in solitude and in a communal setting (i.e. group meditation).

45. Meditation is mental development or Mind Cultivation. Through meditation, one's mind and one's whole life grows spiritually as one's consciousness becomes more developed. One becomes increasingly aware of oneself, of others, of one's environment and ultimately of reality itself. This increased awareness helps deal with everyday life situation with greater calm and insight.

46. The primary form of meditation is sitting meditation. To meaningfully and safely practice sitting meditation for long periods, an adequate meditation cushion (Zafu), meditation mat (Zabuton) or bench (Seiza Bench) is essential. This is because a practitioner needs sufficient spine support to achieve the correct posture and to allow such to be held for extended periods.

47. Without a meditation cushion, an incarcerated practitioner is forced to spend long hours sitting directly on concrete. This can cause loss of circulation and back problems. It is also uncomfortable and impossible to acheive the correct meditation posture. Under such circumstances, even the most earnest practitioner will not be able to meditate in any meaningful way.

48. Rather than meditating directly on concrete, some prisoners use a rolled up blanket. However a rolled up blanket is an insufficient substitute for a meditation cushion and still imposes a substantial burden on the religious practice of meditation. Firstly, blankets are issued by TDCJ for the sole purpose of being used as sleeping covering. To use them as a substitute meditation cushion violates TDCJ policy.
Secondly, a blanket provides inadequate support for the spine, and it is extremely unhygenic to place a blanket on the floor, place ones posterior on it for extended periods, and then use it as a covering to sleep. Prisoners have no way to adequately wash their issued blanket and exchanges are only made twice a year.

49. In December 2021, Plaintiffs Zirus, Martin, Oliver and Cardenas submitted HQ-150 requests to the Religious Practice Committee (RPC) seeking to amend policy to allow Buddhists to purchase and use a meditation cushion for personal use in cell and at Eastern Services. To date, the RPC has not responded to this request.

50. On or about 28th February 2022, Plaintiff filed an I-127 (Step One Grievance) to grieve "the policy that does not allow Buddhist practitioners to purchase a meditation cushion for personal use in cell and at Eastern Services" (See, Attachment A). The response to the I-127 was that current policy "has disapproved the 6' cushions" [Despite the fact none of the grievances mentioned anything about 6' cushions].

51. Plaintiffs then filed a timely I-128 (Step Two Grievance) to which Defendant C.F. Hazelwood, Director of Religious Services, responded on 5th May 2022. The Grievance Response states that: "On 08-07-17, the Religious Practices Committee denied a Buddhist inmate request for a (round or square cushion). The justification was due to security risk. Additionally, the RPC denied a Buddhist inmate request for a 6' cushion for meditation on 06-13-03. The justification was it may present safety and security risks" (See, Attachment A).

52. Because meditation is a religious practice central to Buddhism, the act of denying incarcerated Buddhists the ability to purchase and use a meditation cushion for personal use in their cell or at Eastern Services places a substantial burden on the religious exercise of incarcerated Buddhists because such requires significant modification of their religious

behavior i.e. the inability to meaningfully and safely conduct sitting meditation.

53. There is no compelling governmental interest or bona fide "safety and security risk" to justify the denial of meditation cushions. This is evident from the fact that both meditation cushions (Zafu) and meditation mats (Zabuton) are permitted in the Federal Bureau of Prisons [See, Religious Belief and Practice TRM - T5360.01(2)(B)(5)&(6)].

54. Logic dictates that if meditation cushions do not cause a legitimate security risk in the Federal Bureau of Prisons, then it can not be reasonably construed that TDCJ is any different. TDCJ does not have a unique or special security issue that the BOP is somehow immune.

55. In regards to searching meditation cushions for contraband, such can be searched by TDCJ Officers just as easily as the TDCJ-issued matresses.

56. The absolute denial of meditation cushions is not the least restrictive means of furthering any alleged governmental interest - least of all a compelling one.

57. Therefore, the denial of meditation cushions imposes a substantial burden on the religious exercise of incarcerated Buddhists within TDCJ.

UPOSATHA OBSERVATION

58. TDCJ policy does not recognize Uposatha as an official Buddhist Fast Day.

59. Traditionally, Buddhists set aside at least four days out of the lunar month for observation of Uposatha. These Uposatha sabbaths are: the full moon day [15th of each lunar month]; the new moon day [the last day of each lunar month]; and the 8th day of the waxing and waning moons [the 8th and 23rd of each lunar month]. This is called observing the Uposatha (oo-PO-sa-ta).

60. On Uposatha many lay Buddhists assemble in temples to meditate, make offerings, recite Sutra, and perform acts of veneration to the Three Jewels [Buddha; Dharma; Sangha]. The most common way of observing Uposatha involves taking the Eight Precepts.

61. The Eight Precepts (also known as the Uposatha Precepts) build upon the Five Precepts (See, Paragraphs 25, 26, and 27).

62. When the Eight Precepts are taken for Uposatha Observation, the Third Precept is changed from 'abstaining from sexual misconduct' to obstaining from all sexual acts. The additional three precepts are:

* Abstain from eating food during the period from noon until the following dawn.
* Abstain from watching shows, listening to music, using jewelry, cosmetics and scents.
* Abstain from sitting on high, luxurious seats or lying on high, luxurious beds.

63. These three of the Eight Uposatha Precepts essentially add the principle of restraint of the senses to the Five Precepts. Because they place limits on the pleasure taken from each of the five physical senses, they encourage the examination of attachment to the body and to the sensual pleasures, and instead encourage the pleasure in training ones mind.

64. The specific Uposatha Precept that this suit deals with is the Sixth Uposatha Precept - abstaining from eating food during the period from noon until the following dawn. In this suit, Plaintiffs will refer to this as the "Uposatha Fast".

65. TDCJ Chaplaincy Policy already recognizes a Buddhist "Practice Day" on the 15th of each Gregorian month. This is presumably a substitute for the full moon Uposatha sabbath which falls on the 15th of each Lunar month.

66. As explained in paragraph 38 of this Complaint, TDCJ recognizes 12 "Practice Days" for Buddhists, however observing Buddhists are afforded no type of accommodation for any of those 12 days i.e. no off-work lay-in; no communal meal; no fast day recognition.

67. In January 2021, Plaintiff Zirus submitted a HQ-150 request seeking to have the Uposatha recognized as an official Buddhist Fast Day by TDCJ and for observing Buddhists to receive a sack meal to break the Uposatha Fast. In November 2021, Plaintiff Inthalangsy filed a similar HQ-150 rquest. To date, the RPC has not responded to these requests.

68. On or about 13th February 2022, Plaintiffs filed an I-127 on "the policy that does not recognize Uposatha / Practice Day as an official Buddhist Fast Days". The response to the I-127 was that the twelve Practice Days "are acknowledged Buddhist holy days by the TDCJ and are not designated with lay-ins, fast days or communal meals" (See, Attachment B).

69. Plaintiffs then filed a timely I-128 to which Defendant C.F. Hazelwood, Director of Religious Services, responded on 1st April 2022. The Grievance Response states that: "Per CDM 05.01, Attachment D, there are no approved observances for Buddhist inmates in the recognition of the Buddhist 'Practice' holy days" (See, Attachment B).

70. Plaintiffs aver that TDCJ's acknowledgment of the Uposatha "Practice Days" is absolutely meaningless and superficial without such being officially recognized as a Fast Day. Designation as a Fast Day would provide observing Buddhists certain allowances such as a sack meal to break the fast.

71. The refusal to recognize any of the traditional Uposatha dates or the acknowledged "Practice Days" substantially burdens an observing Buddhists religious exercise because they are unable to meaningfully observe Uposatha without fasting and the opportunity to make up the caloric loss of two meals (To wit, about 1,400 calories).

72. The right that Plaintiffs seek is already afforded to other faith groups.

73. There are at least three Jewish Holy Days that are recognized by TDCJ as official Fast Days. TDCJ accommodates the Jewish Community on these days by providing a lay-in from a work assignment and a substantial sack meal to break the fasts. The Jewish Holy Days that TDCJ does such for are:

- Purim (Adar 14)
- Fast of 9th Av (Av 9)
- Yum Kippur (Tishrei 10)

74. Similarly, TDCJ accommodates the Muslim Community for their Ramadan Fast by providing a hot meal sufficient to make up the caloric loss from that Fast. This meal is essentially a faily 'Communal meal' during the month

of Ramadan, In comparison, the Ramadan Fast prohibits eating during daylight hours. The fast averages about 14 hours. The Uposatha Fast prohibits from noon until dawn the following day. This averaged about 18 hours.

75. The accommodations given to the Jewish and Muslim Communities show that there is no compelling government interest in refusing to recognize Uposatha as an official Buddhist Fast day. It is also evident that "no approved observances for Buddhist inmates in the recognition of the Buddhist 'Practice' holy day", is not the least restrictive means of furthering any alleged governmental interest.

RETREAT

76. For all Buddhists, one of the most indispensible elements of the Three Jewels is the Sangha (community). Therefore, it is essential to meaningful observation that a Prison Sangha be permitted to gather together to commemorate a Buddhist Holy Day by holding Retreat.

77. During the time of Shakyamuni Buddha, his disciples participated in group Retreats in the summer or in the rainy season. In mainland China, Ch'an monasteries held large Retreats in the summer and winter. The methods of repentance and rituals compiled by the Tiantai School patriarchs are meant to be conducted by groups of six, seven and more than ten people in a consecrated space. Thus, Retreat is also a historical and traditional Buddhist practice.

78. Even today, lay practitioners of Buddhism frequently attend Retreat of various lengths to enhance and deepen their personal practices. Retreat offers unique opportunities for spiritual development that are otherwise impossible to achieve as a layperson.

79. On 8th September 2021, Plaintiffs Zirus, Martin, Ledbetter and Panus made a GQ-150 request to the Religious Practice Committee to allow Buddhists to meet and hold a peer-led Retreat on each TDCJ-recognized Buddhist Holy Day, and to be allowed to enjoy a communal meal to commemorate such.

80. In the same HQ-150 request, Plaintiffs also requests to standardize the way Buddhist Holy Days are determined by TDCJ so that they are recognized

and observed on the actual day of commemoration, and not substituted for the closest weekend - which appears to have been the previous practice.

81. On 24th March 2022, Plaintiffs Bygoytia, Oliver, Renfro, and Inthalangsy filed the same HQ-150 request to the Religious Practice Committee.

82. As of this filing, the Religious Practice Committee has not responded to these HQ-150 requests.

83. The following was a proposed schedule for a peer-led Buddhist retreat:

| | |
|---|---|
| 7am | - Set up (Leadership only) |
| 8am | - Start Retreat |
| | - Morning Chant; Group Refuge; Personal Vows before Sangha |
| | - Dharma Talk; Unification Ceremony; Group Meditation |
| 9.30 | - Watch Instructional Dharma DVD |
| 10.30 | - LUNCH (at Dinning Hall) |
| 11am | - Dharma Talk |
| 12pm | - Personal Reflection |
| 1pm | - Watch Buddhist DVD / continue Personal Reflection |
| 3pm | - Question and Answer Session |
| | - Evening Chant and Dedication of Merit |
| | - Pack up room |
| 4.30-5.30pm | - COMMUNAL MEAL at Dinning Hall |

84. On or about 7th March 2022, Plaintiffs filed an I-127 to grieve "the policy that does not permit Buddhist practitioners a group meeting (Retreat/Gathering) and a communal meal for each of the recognized Buddhist Holy/Observance Days" (See, Attachment C). The response to the I-127 was that "the 2022 Holy/Observance Days listing does not authorize Buddhist retreats or 8 hour gatherings with communal meals for any holy days".

85. Plaintiffs filed a timely I-128 to which Defendant C.F. Hazelwood, Director of Religious Services, responded on 27th April 2022. The Grievance Response did not resolve the issue being grieved and instead stated: "the unit chaplain has been instructed to assist you in submitting a Religious Assessment concerning this matter for review by the Religious Practices Committee. No further action from this office is warranted".

86. No unit chaplain contacted any Sangha Member concerning submitting a "Religious Assessment" on this issue.

87. Because Retreat is a religious practice vital to meaningful Buddhist observation, the act of denying incarcerated Buddhists the opportunity to gather together and hold a peer-led Retreat of no less than 8-hours in observation of each of the TDCJ-recognized Buddhist Holy Days places a substantial burden on the religious exercise of incarcerated Buddhists because such requires significant modification of the incarcerated practitioners bahavior i.e. the inability to meaningfully gather together or hold Retreat on Holy Days.

88. For the same reason, denial of a communal meal on all TDCJ-recognized Buddhist Holy Days places a substantial burden on the religious exercise of incarcerated practitioners of Buddhism.

89. Such a peer-led retreat is already afforded by TDCJ policy to the Muslim Community to commemorate EID - i.e. 'Id al-Adha (on or about 20th July 2021; 10th July 2022) and 'Id al-Fitr (on or about 3rd May 2022). This shows that there is no legitimate penological issue allowing peer-led retreats.

90. TDCJ also permits prisoners to attend a 4 day retreat held by the Christian volunteer ministry "Kairos" despite the fact that Christians are not scriptually required to attend such retreat. Although "Kairos" is volunteer led, it shows that such does not impede prison security or scheduling, nor place an unreasonable strain on resources. Since an 8-hour peer led Buddhist Retreat is vastly smaller by comparison, it can not be argued that such would impede prison security or scheduling, or place an unreasonable strain on resouces (especially in light of the accommodations made to the Muslim Community).

91. Plaintiffs aver that, although receiving a lay-in from a work assignment (which is the current accommodation for Buddhist Holy Days) is beneficial to allow solitary practice, it is inadequate to afford meaningful commemoration of Buddhist Holy Days - most of which are communal events. For example, Sangha Day (15th September 2022) is a TDCJ-recognized Buddhist Holy Day designated to celebrate the Buddhist Community. However, TDCJ policy does not permit Buddhists to gather together or share a communal meal on that day. This is counter-intuitive to the meaning of Sangha Day. Such places a substantial burden on meaningful Buddhist observation.

FAITH PREFERENCE RESTRICTION

92. An inmate's "faith preference" is the official declaration of the TDCJ recognized belief system to which that inmate adheres.

93. As per TDCJ policy, to attend a Christian Service or doctrinal study (i.e. Bible study, discussuion group) the inmate's official faith preference is of no consequence. Christians enjoy an 'Open Call' service with no requirement that "Christian" be elected as their faith pregerence.

94. The same does not extend to other faith groups. For an inmate to attend the "Eastern Services", policy requires that they have an elected Eastern Religion as their faith preference in order to receive a lay-in. This severely restricts who can attend the Eastern Services.

95. On 17th November 2021, Plaintiffs Zirus, Martin, renfro, Inthalangsy, Panus, Cardenas, Cross, Oliver and Ledbetter submitted a HQ-150 request to the Religious Practice Committee seeking to remove the requirement that an "Eastern Religion" be elected as an inmate's faith preference in order to recieve a lay-in to attend the Eastern Services.

96. As of this filing, the Religious Practice Committee has not responded to these HQ-150 requests.

97. On or about 20th February 2022, Plaintiffs filed an I-127 to grieve "the systemically discriminatory policies governing the peer-led Eastern Services, namely... that an 'Eastern Religion' must be elected before a prisoner can receive a layin to services" (See, Attachment D). The response to the I-127 was that "there is no need to change, adapt, or update the current policy".

98. Plaintiffs then filed a timely I-128 to which C.F. Hazelwood, Director of Religious Services, responded on 25th April 2022. The Grievance Response stated that: "the Unit Chapel schedule indicates that services are being conducted in accordance with Chaplaincy Department Policy AD-07.30 and procedures. In accordance with procedures, Religious Assessment forms concerning this matter are being processed for review by the Religious Practices Committee. No further action from this office is warranted".

99. Plaintiffs aver that although a lay-in may be necessary to attend the Eastern Services for administrative purposes, there is no compelling governmental interest in restricting who may attend services based upon an arbitrary faith preference election. It is Plaintiffs position that such faith preference election should only be used for religious observation purposes (i.e. holy days, communal meals, uposatha, retreat) and not as a tool to restrict attendance of primary services.

100. The fact that there is no compelling government concern in allowing Christians to have an Open call service with no faith preference restriction, unequivocally shows that there is no legitimate reason not to extend the same to the Eastern Services. Yet, TDCJ refuses to do so.

101. This faith preference restriction creates a substantial burden upon an inmate's religious exercise by limiting access to Eastern Services and works to discourage the exploration of non-Christian faiths. It is an unnecessary burden that is not equally placed upon Christian Services.

102. By the same token, by endorsing unfettered attendance of Christian Services, while arbitrarily restricting attendant of other faith services, the State / Defendants are promoting the Christian faith above all others through this policy.

DOCTRINAL STUDIES

103. Buddhism is study intensive. So although the majority of study is done upon the incarcerated practitioners own schedule and initiative, a practitioner can only progress as far as their ability to teach themselves. As such, in order to avoid spiritual stagnation, it is essential that the practitioner participate in regular group doctrinal studies.

104. This necessity is substantially burdened because TDCJ policy only permits one-hour peer-led primary service per week. This means that because this is the only opportunity for Buddhists to meet, they must choose between conducting a traditional service/group meditation or a doctrinal study. Even if a hybred is somehow conducted, such is insufficient to have a meaningful service or adequate study.

105. To meaningfully practice Buddhism in prison, it is necessary to have the opportunity to hold two meetings per week - one for traditional service / group meditation, and the other a group doctrinal study.

106. There is no compelling governmental interest in not allowing such a doctrinal study in addition to a traditional service / group meditation because such has been permitted to the Muslim Community i.e. a worship service [Taleem] and the other a doctrinal study [Jumu'ah Services]. Christians are also permitted numerous Bible studies in addition to their primary Sunday services.

107. On 17th November 2021, Plaintiffs Zirus, Martin, Renfro, Inthalangsy, Panus, Cardenas, Cross, Oliver and Ledbetter submitted a HQ-150 request to the Religious Practice Committee seeking permission to allow Buddhists to conduct a weekly 2-hour peer-led doctrinal study in addition to their primary Eastern Service.

108. As of this filing, the Religious Practice Committee has not responded to these HQ-150 requests.

109. On or about 20th February 2022, Plaintiffs filed an I-127 to grieve "the systemically discriminatory policies governing the peer-led Eastern Services - namely, peer-led services being limited to one hour, once a week" (See, Attachment D). The response to the I-127 was that "there is no need to change, adapt, or update the current policy".

110. Plaintiffs then filed a timely I-128 to which Defendant C.F. Hazelwood, Director of Religious Services, responded to on 25th April 2022. The Grievance Response states that: "the Unit Chapel schedule indicates that services are being conducted in accordance with Chaplaincy Department policy AD-07.30 and procedures. In accordance with procedures, Religious Assessment forms concerning this matter are being processed for review by the Religious Practices Committee. No further action from this office is warranted".

TWO-HOUR PEER-LED SERVICES

111. TDCJ policy restrict peer-led services to one-hour.

112. One-hour services are insufficient to facilitate a meaningful peer-led Buddhist Service because of the time necessary to properly conduct group meditation and/or Traditional Services. This substantially burdens the religious exercise of incarcerated Buddhists because they have to seriously compound and limit the services in order to comply with the one-hour restriction.

113. In the 'Guidelines for Prison Sitting Groups' by the National Buddhist Prison Sangha and based on the training style at Zen Mountain Monastery, Mountains and Rivers Order, a basic schedule for a Buddhist group meeting is:

Set up
Zazen (20-35 mins) [sitting meditation]
Kinhin (walking meditation (10 mins)
Zazen (20-35 mins)
Liturgy Service:
    3 full bows
    Chant the Heart Sutra with Dedication, and All Buddhas
    3 full bows
Video, audio tape or book discussion (about 20 mins)
Finish with the Four Bodhisattva Vows
Clean up

114. The above basic schedule takes at very least 1½ hours - 2 hours to conduct meaningfully. Other traditional services (i.e. Theravada and Nichiren Shu) take similar amounts of time.

115. There is no compelling government interest in prohibiting two-hour peer led services because TDCJ policy already permits a two-hour service when such is volunteer-led. Additionally, TDCJ policy also permits Field Ministers to conduct two-hour sessions (or more). A Field Minister is an inmate whose job assignment is the promotion of faith (predominately the Christian faith). Because they are inmates their sessions are the functional equivalent of a peer-led service.

116. On 17th November 2021, Plaintiffs Zirus, Martin, Renfro, Inthalangsy, Panus, Cardenas, Cross, Oliver and Ledbetter submitted a HQ-150 request to the Religious Practice Committee seeking permission to allow Buddhists to hold two-hour peer-led services.

117. As of this filing, the Religious Practice Committee has not responded to these HQ-150 requests.

118. On or about 20th February 2022, Plaintiffs filed an I-127 to grieve "the systemically discriminatory policies governing the peer-led Eastern Services - namely, peer-led services being limited to one hour, once a week" (See, Attachment D). The response to the I-127 was that "there is no need to change, adapt, or update the current policy".

119. Plaintiffs then filed a timely I-128 to which Defendant C.F. Hazelwood, Director of Religious Services, responded to on 25th April 2022. The Grievance Response states that: "the Unit Chapel schedule indicates that services are being conducted in accordance with Chaplaincy Department policy AD-07.30 and procedures. In accordance with procedures, Religious Assessment forms concerning this matter are being processed for review by the Religious Practices Committee. No further action from this office is warranted".

PEER-LED KESU

120. A Kesu (also commonly known as a Signing Bowl) is a brass gong bowl, usually no bigger than 4.75" in diameter for a small Kesu; or 7.25" in diameter for a medium Kesu.

121. A Kesu is traditionally used to mark periods of meditation and is struck three times at the start of the period of meditation, and twice at the end. Its sound counterpoints the "stillness of stillness".

122. Although TDCJ policy allows an approved volunteer to bring a Kesu to use at a volunteer-led meditation session, it does not allow a Kesu to be used at a peer-led session.

123. This distinction substantially burdens an incarcerated Buddhists religious exercise because the use of a Kesu to mark periods of meditation is a tradition that is etched in the history of Buddhism. Furthermore, with the absence of its sound to counterpoint the "stillness of stillness", the group meditation session loses its authenticity and the aid to reach deeper states of meditation.

124. There is no compelling governmental interest or bona fide safety or security risk to justify the denial of a Kesu at peer-led services. This is evident from the fact that a singing bowl / Kesu is permitted in the Federal Bureau of Prisons [see, Religious Belief and Practice TRM - T5360.01(2)(B)(7)].

125. Logic dictates that if a Kesu does not cause a legitimate security risk in the Federal Bureau of Prisons, then it can not be reasonably construed that TDCJ is any different. TDCJ does not have a unique or special security issue that the BOP is somehow immune.

126. Furthermore, at the peer-led Sunday Christian Services, the inmates are permitted to use musical instruments as part of their worship. These include electric/acustic guitars, bass, keyboard, electric drum set, microphones, speakers and a sound mixing board.

127. A Kesu is vastly simpler than these musical instruments, and only consists of the singing bowl, a cushion and a small striker. If the musical instruments used by the Christians during their services pose no legitimate penological concern, the same must be true for a Kesu.

128. Thus, the absolute denial of a Kesu at peer-led Buddhist Services is not the least restrictive means of furthering any alleged governmental interest - least of all a compelling one.

129. In December 2021, Plaintiffs Zirus, Martin, Oliver, and Cardenas submitted a HQ-150 request to the Religious Practice Committee seeking to have policy amended to allow the use of a Kesu at peer-led Eastern Services and all meditation sessions.

130. As of this filing, the Religious Practice Committee has not responded to these HQ-150 requests.

WRIST MALAS

131. Mala Beads are religious devotional items used to count Mantras.

132. Mala Beads play an important role for all Buddhists. It is analogous to the Catholic Rosary and consists of a string of beads which can be

short and worn around the wrist, or longer and worn around the wrist or neck.

133. Mala Beads are 'Approved Devotional items for Offender Possession'. As per TDCJ policy, Mala Beads must be black in color, wood or plastic, and no more than 3/8 inch in size. The cord must be breakable and may be constructed of twine, leather or inexpensive but durable fabric.

134. However, the Chaplaincy Manual (CP-05.01) states that Mala Beads "cannot be carried or worn on the wrist outside the dorm area except going to and from or while in a religious service".

135. Although TDCJ policy recognizes Mala Beads as a devotional item, it does not recognize the practice of wearing a Wrist Mala (a Mala specifically designed to be worn on the wrist with either 21 or 27 beads).

136. It is part of the Buddhist practice to recite Mantra throughout the day, and this can not be done effectively without a Wrist mala to count such recitation.

137. There is no compelling governmental interest or bona fide safety or security risk to justify the denial of Mala Beads. This is evident from the fact that Wrist Malas are permitted in the Federal Bureau of Prisons [see, Religious Belief and Practice TRM - T5360.01(2)(A)(2)].

138. Logic dictates that if Wrist Malas do not cause a legitimate security risk in the Federal Bureau of Prisons, then it can not be reasonably construed that TDCJ is any different. TDCJ does not have a unique or special security issue that the BOP is somehow immune.

139. Furthermore, wearing Mala Beads on the wrist does not create a security or other compelling governmental concern because the Chaplaincy Manual allows Mala Beads to be worn on the wrist "going to and from... a religious service". The Chaplaincy Manual also approves "4 Life" rubber bracelets from Prison Fellowship and the 'Spiritual Dynamics of Criminal Recovery and Relapse Prevention Program Bracelet' (See, CP-0501 (rev. 1) att. B).

140. The absolute denial of Wrist Malas are not the least restrictive means of furthering any alleged governmental interest - least of all a compelling one.

141. In December 2021, Plaintiffs Zirus, Martin, Oliver, and Cardenas submitted HQ-150 requests to the Religious Practice Committee seeking to have policy amended to allow Wrist Malas to be worn by Buddhists at all times.

142. As of this filing, the Religious Practice Committee has not responded to these HQ-150 requests.

BUDDHIST NEW YEAR SPEND

143. The Buddhist New year is a TDCJ-recognized Buddhist Holy Day.

144. Buddhist New Year is one of the most important annual holidays in Chinese and other culturally Buddhist communities. It is determined by the Lunar Calander and usually falls in late January or early February.

145. On 7th July 2021 Plaintiffs Zirus and Inthalangsy submitted a HQ-150 request to the Religious Practice Committee seeking that they adopt policy that allows practicing Buddhists to make a special outside purchase through an approved vender of traditional and culturally appropriate food items to celebrate the Buddhist New Year. A catalogue from Walkenhorst's with 200 proposed food items accompanied the HQ-150 submission. Walkenhorst's is a company that specializes in providing a large variety and selection of products to prisons throughout America.

146. As of this filing, the Religious Practice Committee has not responded to this HQ-150 request.

147. On or about 16th March 2022, Plaintiffs filed an I-127 to grieve "the policy that does not permit the Buddhist Community to commemorate the Buddhist New Year by making a special purchase of traditional and culturally appropriate food items - equivalent to the Jewish Passover Spend" (See, Attachment E). The response to the I-127 was that "at this time the Robertson Unit Chaplaincy will continue to follow current policy. However,

an HQ-150 Religious request for accommodation can be submitted to have the Religious Practices Committee (RPC) consider the request for approval. No action warranted".

148. Plaintiffs then filed a timely I-128 to which Defendant C.F. Hazelwood, Director of Religious Services, responded on 6th May 2022. The Grievance Response states that: "Unit Chaplains followed current Chaplaincy policy concerning this matter. Religious Assessments, (HQ-150s) are being processed and this issue will be presented to the Religious Practice Committee for review. No further action from this office is warranted".

149. The denial of the ability to make a special outside purchase substantially burdens a Buddhist practitioners observation of the Buddhist New Year because practitioners do not have access to traditional or culturally appropriate food items from the unit commissary - beyond plain white rice.

150. Jewish inmates have long been afforded the accommodation of a special Passover purchase through the unit commissary. This accommodation has not caused a proliferation of similar requests.

151. This shows that there is no compelling governmental interest in not extending this form of accommodation to Buddhists to make a special commissary purchase or outside vendor purchase of traditional and culturally appropriate food items to celebrate the Buddhist New Year.

152. An obvious issue that has resulted from TDCJ allowing the Jewish Passover Spend is that alot of inmates have insincerely changed their faith preference to 'Jewish' only to benefit from the privilege of that faith group. These inmates are commonly known as "Paper Jews".

153. In the interest of preventing "Paper Buddhists" the submitted HQ-150s proposed a rule in order to qualify for the Buddhist New year Spend: That the inmate not only must have "Buddhism" designated as their official faith preference, but that they also regularly attend the weekly Eastern Service (if such is available on the unit). Failure to regularly attend

the Eastern Service would thus disqualify the inmate from the Buddhist New year Spend. This works in concert with the TDCJ policy that removes the inmate from the Service Lay-in List if they miss three consecutive Services .

V.
EXHAUSTION OF CLAIMS

154. As per TDCJ policy AD-07.30(IV) all "[d]ecisions of the RPC shall be final".

155. Presumably a HQ-150 is the prescribed procedure to exhaust a claim related to religious exercise within the Texas Department of Criminal Justice.

156. However, Plaintiffs aver that the HQ-150 process has proven an ineffectual remedy because the "Religious Practices Committee (RPC) meets quarterly with no timeframe for decision to be made" (See, Step 1 Response at Attachment B).

157. Back in early **2017**, Plaintiff Zirus filed two separate HQ-150 requests (See, Attachment F). Neither were responded to until April **2019** - over two years later.

158. This has proven to be a systemic practice as is evidenced by the fact that the HQ-150 concerning Uposatha Observation was submitted back in January 2021. As of this filing, this HQ-150 request has been pending before the Religious Practice Committee for over 20 months.

159. Plaintiffs assert that this renders the HQ-150 "unavailable" as an administrative remedy for §1997e(a) purposes. See, Ross v. Blake, 136 S.Ct. 1850 (2016). As such, Plaintiffs should not be required to wait for an answer from the religious Practice Committee before bringing suit with this Court. The Religious Practice Committee has been presented with all the issues raised in this action, and they have chosen not to respond within a reasonable amount of time. Prisoners should not be required to wait years to exhaust an issue for §1997e(a) purposes.

160. With this in mind, and out of an abundance of caution, Plaintiffs also utilized the Offender Grievance Process in order to exhaust the issues presented in this action.

161. The Step One (I-127) and Step Two (I-128) Grievances filed by each Plaintiff for each issue can be found at the following ATTACHMENTS:

> Meditation Cushion - Attachment A
> Uposatha Observation - Attachment B
> Retreat - Attachment C
> Faith Preference Restriction - Attachment D
> Doctrinal Studies - Attachment D
> Two-Hour Peer-Led Services - Attachment D
> Buddhist New Year Spend - Attachment E

## VI.
## LEGAL CLAIMS

162. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow Buddhists to purchase a meditation cushion for personal use in cell and at Eastern Services or Buddhist Retreats. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.
This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

163. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to recognize Uposatha as an official Buddhist Fast Day and provide observing Buddhists a sack meal of no less than 1,400 calories to break the fast. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.
This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

164. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow Buddhists to gather together and hold a peer-led retreat of no less than 8-hours in observation of each of the TDCJ-recognized Buddhist Holy Days. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.

This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

165. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow Buddhists to share a communal meal over a period of one-hour in observance of each of the TDCJ-recognized Buddhist Holy Days. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling government interests.

This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

166. Plaintiffs rights protected under RLUIPA are violated by Defendants continuance of the policy requiring that an "Eastern Religion" be elected as the inmates official faith preference in order to recieve a lay-in to attend the Eastern Services. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.

This continuance of the policy also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

167. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow Buddhists a weekly 2-hour peer-led study in addition to their primary service. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated

and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any governmental interests. This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

168. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow at least 2-hours for Buddhists to conduct a peer-led primary service. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated, and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.
This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

169. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow the donation of, and the regular use of, a Kesu (brass gong bowl) during all peer-led Buddhist meditation sessions and peer-led Eastern Services. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarily situated, and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.
This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

170. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow Buddhists to purchase and wear Wrist Malas at all times. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated, and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.
This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

171. Plaintiffs rights protected under RLUIPA are violated by Defendants refusal to allow Buddhists to make a special purchase of traditional and culturally appropriate food items to celebrate the Buddhist New Year. This is because such imposes a substantial burden on the religious exercise of Plaintiffs and those similarly situated, and is not in the furtherance of a compelling governmental interest, nor the least restrictive means of furthering any compelling governmental interests.
This refusal also constitutes an Equal Protection violation under the Fourteenth Amendment to the United States Constitution.

172. The Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiffs have been and will continue to be irreparably injured by the conduct of the Defendants unless this Court grant the declaratory and injunctive relief which Plaintiffs seek.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment granting Plaintiffs:

173. Certify this matter as a class action representing all Buddhists within the Texas Department of Criminal Justice pursuant to Rule 23(a) and (b)(1)(B) or (b)(2) of the Federal Rules of Civil Procedure.

174. Issue a declaratory judgment declaring that the acts and omissions described herein violate the rights of Plaintiffs and those similarly situated under the Constitution and the laws of the United States.

175. Issue a permanent injunction ordering Defendants to allow Buddhists to purchase a meditation cushion for personal use and at Eastern Services and Buddhist Retreats.

176. Issue a permanent injunction ordering Defendants to recognize Uposatha as an official Buddhist Fast Day and to provide observing Buddhists a sack meal of no less than 1,400 calories to break the fast.

177. Issue a permanent injunction ordering Defendants to allow Buddhists to gather together and hold a peer-led Retreat of no less than 8-hours in observation of each of the TDCJ-recognized Buddhist Holy Days.

178. Issue a permanent injunction ordering Defendants to allow Buddhists to share a communal meal over a period of one-hour in observation of each of the TDCJ-recognized Buddhist Holy Days.

179. Issue a permanent injunction ordering Defendants to cease the policy that requires that an "Eastern Religion" be elected as an inmate's official faith preference in order to receive a lay-in to attend the Eastern Services.

180. Issue a permanent injunction ordering Defendants to allow Buddhists to conduct a weekly 2-hour peer-led doctrinal study in addition to their primary Eastern Service.

181. Issue a permanent injunction ordering Defendants to allow at least 2 hours per week for Buddhists to conduct a peer-led primary Eastern Service.

182. Issue a permanent injunction ordering Defendants to allow the donation of, and regular use of, a Kesu (brass gong bowl) during all peer-led Buddhist meditation sessions and peer-led Eastern Services.

183. Issue a permanent injunction ordering Defendants to allow Buddhists to purchase and wear Wrist Malas at all times.

184. Issue a permanent injunction ordering Defendants to allow Buddhists to make a special purchase of traditional and culturally appropriate food items to celebrate the Buddhist New Year.

185. A jury trial on all issues triable by jury.

186. Award Plaintiffs reasonable attorney fees and costs of this action pursuant to 42 U.S.C. 1988.

187. Any additional relief this Court deems just, proper, and equitable.

Respectfully Submitted, 12th August 2022

**Inner Liberation Prison Sangha:-**

Scott Zirus #1640002
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

Santhy Inthalangsy #2186559
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

Kenric Ledbetter #628824
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

David Martin #2125617
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

Isaac Cardenas #2230470
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

Miguel Bygoytia #2161244
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

James Renfro #1937567
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

Justin Panus #2167693
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

Richard Cross #2100125
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

William Oliver #2290434
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

VERIFICATION

I have read the foregoing Complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Abilene, Texas on 12th August 2022.

Scott Zirus

Santhy Inthalangsy

Kenric Ledbetter

David Martin

Isaac Cardenas

Miguel Bygoytia

James Renfro

Justin Panuss

Richard Cross

William Oliver

Scott Zirus #1640002
Robertson Unit
12071 FM 3522
Abilene, TX 79601

Courts
District of Texas
ED
AUG 2 3 2022
Nathan Ochsner, Clerk of Court

US District Court
Southern District of Texas
P.O. Box 61010
Houston, TX 77208

Legal Correspondence